Robert D. L. Gardiner v. Commissioner.
Gardiner v. Commissioner
Docket No. 4529.
United States Tax Court
1945 Tax Ct. Memo LEXIS 128; 4 T.C.M. (CCH) 689; T.C.M. (RIA) 45224; June 29, 1945
Abraham Hornstein, Esq., for the petitioner. Ellyne E. Strickland, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: This proceeding was brought for a redetermination of a deficiency in income tax for 1937 in the amount of $3,539.73. The issue is whether petitioner's loss, connected with a publishing venture, was subject to *129 the capital loss limitation provisions of section 117 (d), Revenue Act of 1936. Findings of Fact Petitioner's income tax return for the year 1937 was filed with the collector for the third district of New York. In May, 1937 petitioner was 25 years old. He had never been engaged in any business venture or enterprise and was seeking to associate himself with one. Through Elizabeth Churchill, a newspaper reporter, petitioner in May, 1937 was introduced to Robert and Betty Criswell, who since April of that year had been engaged in publishing a magazine called "Bachelor." Robert Criswell was an attorney and Betty Criswell was a writer. Under the name of Fanchon Devoe, she was editor of the magazine; Robert Criswell was the business manager. Their original home was Circleville, Ohio. By an agreement dated June 3, 1937, between the Criswells as "vendors" and petitioner as "purchaser," petitioner purchased for $25,000, 980 shares or 49 percent of the common stock of The Bachelor, Inc., a corporation which had been organized for the purpose of publishing the magazine. The agreement provided, inter alia: "Whereas the Vendors are the owners and holders of record of all of the issued *130 and outstanding stock of The Bachelor, Incorporated, a Delaware Corporation (hereinafter referred to as the 'Corporation'), to wit two thousand (2,000) shares of no par value voting common stock, and "Whereas the Purchaser is desirous of purchasing a forty-nine (49%) per cent interest in said stock, or nine hundred and eighty (980) shares, and the Vendors are agreeable to selling the same upon the terms and conditions hereinafter stated. "NOW THEREFORE, in consideration of the premises and the mutual promises of the parties, it is agreed as follows: "FIRST: The Vendors agree to sell to the Purchaser and the Purchaser agrees to purchase from the Vendors, nine hundred and eighty (980) shares of common stock of the Corporation for the total purchase price of Twenty-five thousand ($25,000.00) Dollars, payable as follows: Ten thousand ($10,000.00) Dollars upon the execution hereof. Five thousand ($5,000.00) Dollars on July 3, 1937. Five thousand ($5,000.00) Dollars on August 3, 1937 and Five thousand ($5,000.00) Dollars on September 3, 1937. "The three (3) Five Thousand ($5,000.00) Dollar payments to be evidenced by three (3) promissory notes of the Purchaser, each in the *131 amount of Five thousand ($5,000.00) Dollars, maturing respectively on July 3, 1937, August 3, 1937 and September 3, 1937. "SECOND: Delivery of the nine hundred and eighty (980) shares shall be made to the Purchaser on or about June -, 1937. "THIRD: It is agreed that in the event the working capital of the Corporation is not sufficient to cover the operating expenses of the Corporation for the next 12 months, the Vendors and the Purchaser shall each advance and loan to the Corporation, without interest 49% of the sum necessary to meet and cover the deficiency in said expenses and Miss Elizabeth Churchill shall advance and loan to the corporation as aforesaid two percent (2%) of such sum. * * * *
"SIXTH: The Vendors hereby give to the Purchaser, an option, exercisable at any time before June 3rd 1938, to purchase a number of shares sufficient to give said Purchaser voting control of the Corporation, the price of the stock subject to this option to be the book value of the stock of the Corporation at the time the option is exercised. * * * *
"Seventh A. The Vendors represent and warrant that the Corporation is the owner and publisher of the magazine known as The 'Bachelor'. *132 "EIGHTH: The Purchaser expressly agrees that this agreement represents the entire understanding between the parties hereto and that the Vendors have made no representations or warranties of any kind as to the Corporation or its business. * * * *
"TENTH: It is understood and agreed that Fanchon Devoe shall, subject to illness or other incapacity remain editor of the corporation for a period of one year from date." In addition to furnishing the needed capital petitioner intended to participate actively in the advertising end of the business. Being a New Yorker with a social background and connections with friends who were potential advertisers, it was believed that he would be able to secure advertising contracts. He saw various friends and was successful in getting some advertising. Some advertising space was given free to prominent advertisers, as is customary when a magazine is started. Petitioner was present at the Criswells' suite of rooms at the Savoy-Plaza Hotel daily, conferring with the Criswells. The business was conducted from these rooms which were the Criswells' residence. There was an office on Madison Avenue but it was not used by petitioner or the Criswells. *133 Petitioner was not satisfied with the operation of the magazine and its business by the Criswells. His criticisms were ignored. Petitioner was aware of the corporate form of organization and the protection it afforded him from liability. He also realized that it had no effect on his liability under the June 3 agreement. Under this agreement petitioner had a year's option to purchase a sufficient number of shares to give him voting control of the corporation. Petitioner offered to purchase additional stock on the condition that Betty Criswell was to be replaced as editor, but this offer was not accepted. Under the agreement, in addition to the $25,000 invested in capital stock, petitioner was bound to advance and loan to the corporation each month for a year after June 3, 1937, 49 percent of any sums necessary to meet the deficiency in the operating expenses. In August, 1937, petitioner made a loan to the corporation of $2,000 for this purpose. The production costs had been running about $7,000 to $10,000 a month. Because of their differences in opinion as to the policy to be pursued in the management of the business and because petitioner desired to be relieved of the liability *134 to make further advances to the corporation, an agreement was entered into on August 20, 1937, by The Bachelor, Inc. as "the Corporation," Robert L. Criswell and Betty Criswell as "the Purchasers" and petitioner as "the Seller," providing, inter alia, as follows: "THIRD: The Purchasers and the Seller do hereby respectively acknowledge that they are now stockholders of the Corporation, the party of the first part hereto. "FOURTH: The Purchasers and the Sellers do hereby acknowledge that they have come to the agreement and understanding that it is detrimental to the interests of all the parties hereto for both the Purchasers and the Seller to continue with the control of the business of the Corporation because the Purchasers and the Seller are in disagreement and conflict in respect to the policies to be pursued and adopted by the Corporation and that it would therefore be to the best interests of all parties hereto that the Seller shall sell, transfer and assign unto the Purchasers in form suitable for transfer on the books of the Corporation the shares of stock of the Corporation owned by the Seller and issuable to him by the Corporation and all Seller's right, title and interest *135 in and to the said shares of stock. "FIFTH: The Purchasers do hereby acknowledge that the assets of the Corporation as of date hereof exceed the Corporation's liabilities. "SIXTH: The Purchasers and the Seller do hereby cancel and make void any and all monies whatsoever owing from the Corporation to the Seller and the Seller does hereby make a gift of any and all such monies to the Corporation and does hereby remise, release and forever discharge the Corporation of and from liability therefor. "SEVENTH: The Seller does hereby sell, assign, set over and transfer unto the Purchasers, or to their respective nominees, in equal shares, all his right, title and interest in and to all the shares of stock of the Corporation owned by him and issuable to him, without payment therefor other than as specifically recited in this agreement, and the Seller does hereby authorize and direct the duly authorized officers of the Corporation to issue the shares of stock issuable to the Seller, to the Purchasers or to their respective nominees, in equal shares. "EIGHTH: The Purchasers and the Seller do hereby cancel and void the agreement heretofore entered into between them dated June 3, 1937 with *136 the same full force and effect as though the same had not been executed and the Corporation does hereby consent to such cancellation. "NINTH: The Purchasers do hereby jointly and severally agree to hold the Seller harmless of and from any and all claims against him by the Corporation or by anyone claiming by, through, under or against the Corporation. "TENTH: The parties hereto simultaneously with the execution of this agreement shall exchange general releases." Simultaneously with the execution of the agreement the parties executed and exchanged general releases. In his income tax return for the year 1937 petitioner claimed a deduction of $28,000 for the loss alleged to have been sustained by him on the disposition of his interest in The Bachelor, Inc., stating: "Loss on 'The Bachelor Magazine Inc.' -
In June 1937, the taxpayer bought 49% of the Capital stock of this
Company for cash
$25,000.00
"Subsequently, he advanced on the Company's Note
2,000.00
"During September 1937, as a result of an agreement between the
taxpayer and the Company, the taxpayer turned back to the
Company the stock held by him and cancelled the note for
$2,000.00 in exchange for a release from the Company for any
and all liabilities present or future
"The attorneys fees in connection with this settlement were
1,000.00
$28,000.00
*137 Petitioner paid an attorney's fee of $1,000 in connection with the transaction covered by the agreement dated August 20, 1937. At the time of execution of the August 20, 1937, agreement the assets of The Bachelor, Inc. exceeded its liabilities. In his notice of deficiency respondent treated the loss as a loss on the sale of a capital asset and permitted the deduction only to the extent of $2,000. Opinion Under Revenue Act of 1936, petitioner was entitled to deduct in full the undisputed loss he suffered in connection with his illfavored publishing venture if it did not result from the sale or exchange of a capital asset. [1] Stated conversely an ordinary loss, such as that resulting from worthlessness, was then deductible in full. [2] The interest petitioner had acquired was disposed of by what was called a "sale," and the corporation's assets then exceeded its liabilities. *138 There can be little doubt that what petitioner first acquired and then relinquished was a capital asset, both in its ordinary sense and under the statutory definition. Even if the form which petitioner's investment took had not been capital stock, it was clearly a share in the business which for all that appears was composed entirely of property answering the description of capital assets. Nor can there be greater question that petitioner's disposition constituted a sale or exchange. What really happened, irrespective of nomenclature, was a modification of the earlier agreement between petitioner and his vendors. He returned the stock and received in exchange a release from future liability. This supplies the requisites of a sale and creates a capital loss. , affd. (C.C.A., 9th Cir.) , certiorari denied , rehearing denied . Respondent does not appear to challenge seriously petitioner's right to deduct his attorney's fees, and to this extent the deficiency seems clearly erroneous, under both section 23 (a) of the 1936 Act and section 121, Revenue Act of 1942. *139 Decision will be entered under Rule 50. Footnotes
1. "SEC. 23. DEDUCTIONS FROM GROSS INCOME. "In computing net income there shall be allowed as deductions: * * * *
"(e) Losses By Individuals. - In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise - "(1) if incurred in trade or business; or "(2) if incurred in any transaction entered into for profit, though not connected with the trade or business"; "SEC. 117. CAPITAL GAINS AND LOSSES. * * * *
"(b) Definition of capital assets. - For the purposes of this title, 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business); but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. * * * *
"(d) Limitation on capital losses. - Losses from sales or exchanges of capital assets shall be allowed only to the extent of $2,000 plus the gains from such sales or exchanges. * * *" ↩
2. "Art. 117-4. Application of section 117 generally. - Sec. 117 applies only to gains and losses upon the sale or exchange of capital assets and, therefore, has no application to * * * loss sustained as the result of corporate stock or debts becoming worthless." [Regulations 94]↩